UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DAVID L. WELSH,

        Plaintiff,

        v.

METROPOLITAN LIFE INSURANCE
COMPANY, and DELOITTE & TOUCHE
GROUP INSURANCE PLAN,

        Defendants

No. C04-5143RBL

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

This matter is before the court following a November 1, 2005, trial on the administrative record in this case. The court previously determined that the proper standard of review for the Plaintiff's claim was the deferential "abuse of discretion" standard, as the policy in question permitted the claims administrator to exercise discretion in evaluating Plaintiff's claim. *See* Dkt. #30; *Kearney v. Standard Insurance Co.*, 175 F.3d 1084 (9th Cir. 1999). The Court has reviewed the materials submitted (which includes extensive briefing and the administrative record of MetLife's review and determination of Plaintiff Welsh's claim for disability benefits under the policy), and considered the argument of counsel.

The court makes the following findings of fact and conclusions of law.

**Findings of Fact**.

1.    Plaintiff was employed by Deloitte & Touche as a tax consultant/CPA. In June 1994, plaintiff was informed that he would be fired because of conflicts with staff, and performance problems. Plaintiff's last day of work was August 31, 2004. Thereafter, plaintiff started his own tax consulting practice. (*CF 100197, 100482, 100780*.)

ORDER    1

2. Defendant Deloitte & Touche Group Insurance Plan is an employee benefit plan governed by ERISA, ("the plan") and Defendant Metropolitan Life Insurance Company ("MetLife") is the claims administrator under the plan. *(MET 0081-0101).*

3. The plan provides the following definition of disability:

> Disability or Disabled means that due to an Injury or Sickness, you require the regular care and attendance of a doctor and:
>
> 1. you are unable to perform each of the material duties of your regular job; and
>
> 2. after the first 24 months of benefit payments, you must be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience, and past earnings; or
>
> 3. you, while unable to perform all of the material duties of your regular job on a full-time basis, are:
>
>> a. performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and
>>
>> b. earning currently at least 20% less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness.

*(MET 0086-0087).*

4. Plaintiff submitted a claim for long-term disability benefits to MetLife dated November 29, 1994. Plaintiff claimed that he was disabled as of July 13, 1994, but acknowledged that he admittedly performed work after the date of his alleged disability, noting "part time tax consulting (self-employed)" and continued work at Deloitte & Touche. He also worked as a tax consultant/CPA after he was terminated. Upon MetLife's request, plaintiff provided additional information about his training, education, and experience. *(CF 100773, 100764).*

5. The duties of a tax consultant, accountant, and department manager are largely sedentary. The essential duties of this occupation are: preparing tax returns, examining financial

records, advising clients on tax issues, ensuring compliance with taxing authorities, identifying client needs or problems, and directing or coordinating subordinates.  (*CF 100309; 100773; 100085*).

6.  Plaintiff wrote letters to MetLife in support of his claim, including his contention that there were four "material duties" of his regular job:

> A)  Analyze all new laws, regulations and court decisions regarding state and local tax issues.  Keep the Firm advised of all material developments and their possible effects on clients.
>
> B)  Negotiate highly technical tax agreements with state and local tax authorities.  This involves issues not agreed to by taxpayers and lower level specialists.  The amounts at issue varied from thousands to millions of dollars.
>
> C)  Advise clients on how to minimize state and local taxes on highly complex business transactions.
>
> D)  Supervise and manage a tax practice of seventeen (17) highly paid, highly trained tax specialists producing over $3,000,000 per year in gross revenue.  (*CF 100599*).

7.  An April 21, 1994, memo from plaintiff's supervisor was critical of plaintiff's performance and ability to get along with others.  The letter stated that plaintiff "tends to be openly critical of people outside his group (in particular, partners)," "does not appear to be hands on with his people," "has undermined Roger Mierzwa's chances for success by being openly critical and making little effort to direct work his way," "continually carries a chip on his shoulder", "is openly critical of old tax management," "appears to have hired people without any idea whether work is/or will be available for them" "seems estranged from everyone in the organization" and "seems lazy." *(CF 100085).*

8.  In June 1994, plaintiff was notified that his employment at Deloitte & Touche would be terminated in two months because "he was bitter and did not produce and he caused some trouble between staff" and had also engaged in questionable billing practices. (*CF100482*).

9.  Plaintiff's wife also acknowledged that his performance issues related to his inability to get along with others. (*CF 100557-558*)

10. Plaintiff took no time off for sick leave from May 29 to June 11, 1994, and there is no evidence plaintiff took any sick leave prior to May 29, 1994. From June 12 to July 9, 1994, plaintiff's employee time sheets indicate he took only ½ day for sick time. After plaintiff was told he would be terminated, he took substantial sick time off work. (*CF100746 - 100754*).

11. Dr. Paul Azer, an endocrinologist who treated the plaintiff, submitted a completed form in support of plaintiff's claim. Dr. Azer listed plaintiff's primary diagnosis as diabetes and his secondary diagnoses as hypertension, possible angina, gout, and glaucoma. Although the form requested an evaluation of the patient's physical abilities and mental limitations, Dr. Azer did not provide this information. The form also asked the physician to specifically state whether the patient is disabled from his own occupation and from any occupation. Dr. Azer stated that he "cannot determine" in response to both questions. (*CF 100359-100360*).

12. Plaintiff also treated with ophthalmologist Laura Fox. At that time, Dr. Fox did not submit evidence supporting plaintiff's claim for disability. (*CF 100655*).

13. On January 3, 1995, MetLife asked Dr. Azer to complete a Physical Capacities Evaluation (PCE), to provide all office notes from May 1994 to the present, to provide a copy of all objective tests, and give a date that plaintiff could return to work. In response to the requests, Dr. Azer submitted only two inconsistent PCE forms. The first, dated January 11, 1995, provided that plaintiff could sit for a full 8-hour workday. On the second form, dated February 9, 1995, Dr. Azer did not answer any of the specific questions, stating instead: "Pt. is disabled bec. of diabetes, hypertension, arthritis, and chest pains. Send a copying service." (*CF 100726, 100732, 100769*).

14. MetLife made a second request for Dr. Azer's records on January 31, 1995. MetLife received a letter from Dr. Azer, dated March 3, 1995, which stated that plaintiff has hypertension, chest pain, diabetes, arthritis, gout, and depression. Dr. Azer concluded that plaintiff "is depressed and disabled. If this information is not sufficient, I suggest you have him evaluated by a disability doctor more expert than I in filling out forms." (*CF 1000724; 100726, 100732, 100775;* ).

15. On March 6, 1995, MetLife advised plaintiff that it had still not received Dr. Azer's medical records. (*CF 100722*).

16. On April 12, 1995, MetLife called Dr. Azer's office to request plaintiff's medical records for the third time. No response was received. (*CF 100712*).

17. On April 18, 1995, MetLife sent a fourth request to Dr. Azer. (*CF100712*).

18. Finally, on May 1, 1995, MetLife received records from Dr. Azer. Included in those records was a California Department of Social Services Doctor's Certificate Dr. Azer had filled out on September 12, 1994. Contrary to what he told MetLife, Dr. Azer stated that plaintiff's first date of disability was July 7, 1994, but that plaintiff could resume his regular and customary work by December 1, 1994. (*CF 100683; 100686*).

19. The records also revealed that Dr. Azer had referred plaintiff to a cardiologist, J. Kevin Drury, M.D., for consultation for chest pain. Plaintiff consulted with Dr. Drury only one time. Plaintiff completed an exercise treadmill test and "did not experience chest pain during the exercise." Dr. Drury's report concluded that plaintiff does not have a heart condition, such as angina, and that "no further cardiac investigations are indicated . . . ." (*CF 100701 - 100703*).

20. Dr. Azer's 1994 records for plaintiff first reference depression on July 7, 1994, noting plaintiff "got fired 1 mo. ago. Personality." He noted no crying; no binging. Dr. Azer noted the depression was "probably transient" and prescribed a low dose of Prozac. (*CF 100711*).

21. Twelve days later, on July 19, 1994, Dr. Azer noted that plaintiff's "depression [was] much better." *(CF 100710)*

22. The records of Dr. Fox, plaintiff's ophthalmologist, were received. They indicate that plaintiff has had glaucoma for over 20 years. On May 18, 1995, Dr. Fox wrote a brief letter indicating the only limitation caused by glaucoma was that plaintiff should not drive after dark. *(CF 100655)* Dr. Fox did not provide any other support for plaintiff's claim of disability. (*CF 100667-100679, 100733*).

23. MetLife requested an independent opinion of plaintiff's impairment levels, restrictions, and limitations. *(CF 100653; 100659).* Dr. Petrie, a Board Certified Specialist in Occupational Medicine, provided a detailed report. (*CF 100646-100651*). He analyzed the records of Drs. Azer and Fox. Dr. Petrie examined each of plaintiff's diagnoses and found that none of them would prevent him from working. He noted that since plaintiff's chest pains were non-cardiac they would not cause any functional limitations and plaintiff's hypertension and diabetes were both controllable by medication. Finally, Dr. Petrie concluded that plaintiff presented very little information regarding any pre-existing condition prior to his being fired. (*CF 100646-100651*).

24. Dr. Petrie also noted that Dr. Azer's records included a comment that plaintiff's depression was transient or situational. It was Dr. Petrie's opinion that plaintiff's depression was caused by being fired and did not exist before his termination. Dr. Petrie determined there was insufficient documentation in the file to support a claim of disability. Dr. Petrie explained that his opinion was based on the failure of Dr. Azer to show what impairment exists that would preclude plaintiff from performing his previous sedentary occupation. (*CF 100646-100651*).

25. On June 5, 1995, MetLife sent a copy of Dr. Petrie's report to Dr. Azer for his comment. MetLife asked Dr. Azer to submit objective medical evidence if he disagreed with the report. Dr. Azer responded with a short letter on June 20, 1995. Dr. Azer wrote, "I do not agree with Dr. Petrie's conclusion. [Plaintiff's] depression has continued for years. He has a family history of suicide … I believe ["Plaintiff's] many medical problems can be traced to working in a high stress environment. I strongly feel he should not be employed in a position requiring long hours or high stress." (*CF 100640-100642)*.

26. On July 5, 1995, MetLife notified plaintiff that the evaluation of his claim had been completed and concluded that the medical records provided by Drs. Azer and Fox, which were sent for an independent review, did not support a finding that plaintiff was disabled from his job. (*CF 100611-100614*).

ORDER                                                                 6

27.     Plaintiff appealed that decision on July 27, 1995. He claimed that his glaucoma prevented him from working late night hours because he has poor night vision. But, there is no evidence that night driving was a "material job duty" of a tax consultant. Plaintiff also emphasized that his complaint was not depression, but instead was his alleged symptoms related to diabetes. Plaintiff did not provide any additional evidence in support of his appeal. (*CF 100599-100602*).

28.     MetLife reviewed plaintiff's appeal and advised plaintiff, on August 14, 1995, that the prior decision would be upheld because he did not satisfy the definition of disability under the plan. (*CF 100596-100597).*

29.     Plaintiff's wife disputed that decision on November 7, 1995, and provided a report from Dr. Katz, a psychiatrist, who first saw plaintiff in September 1995, over one year after he was terminated. Plaintiff's wife claimed that his "depression was caused by the nature of his occupation, the constant stress of disputing chargeable hours with partners, bills with clients, and tax issues with government officials. [Plaintiff] had no authority over these individuals but was required to convince them they were in error. People don't like to be told they are wrong. Every time [Plaintiff] won, he only succeeded in creating an advisary (sic.) who was even more determined to win the next confrontation. It was a constant, high stress, confrontational no-win position …" Plaintiff's wife advised that they had retained an attorney and that MetLife should respond to the attorney. *(CF 100592-100594).*

30.     Dr. Katz reported plaintiff began seeing him in September 1995 and that currently (October 1995) plaintiff was diagnosed with a Major Depressive Disorder. Dr. Katz initially opined that plaintiff had depression dating back to 1991. He later stated plaintiff had depression as far back as 1986. According to Dr. Katz, plaintiff's 1991 depression continued throughout his employment with Deloitte & Touche and was precipitated by his employer's withholding of a large performance bonus. Dr. Katz indicated plaintiff's most severe depression, while still working, was in the 1991-1992 period. Dr. Katz did not state that plaintiff was disabled from depression at any time from July through

ORDER                                              7

August 1994. When he examined plaintiff in October 1995, he noted he was "without psychosis." *(CF 100580-100583).*

32. On November 15, 1995, MetLife conducted an additional review. The review recommended upholding the denial because the medical records did not show that plaintiff was disabled by a physical condition and plaintiff did not commence psychiatric treatment until more than a year after he was fired. *(CF 100560).*

32. MetLife notified plaintiff's attorney of its final decision on December 5, 1995. *(CF 100543-100545).*

33. Plaintiff filed a lawsuit in the U.S. District Court for the Central District of California. The Court granted summary judgment to MetLife and Deloitte and plaintiff appealed to the Ninth Circuit Court of Appeals. *(Complaint, Ex. C).*

34. The Ninth Circuit remanded the case back to the District Court with instructions to remand the matter to MetLife to "reexamine [plaintiff's] claim applying the correct definition of disability." The Ninth Circuit ruled that it was unclear what definition of disability had been applied to plaintiff's claim and that it was unclear whether MetLife had considered if plaintiff was disabled under prong three of the plan's disability definition. As a result, the Ninth Circuit held that MetLife had abused its discretion in handling Welsh's initial claim. *(Complaint, Ex. D).*

35. On remand MetLife was instructed to apply the policy's disability definition and allow plaintiff to submit additional records in support of his claim under this definition. *(Complaint, Ex. D).*

36. On April 24, 2001, plaintiff's lawyer submitted a letter to MetLife with updated medical records from new treating physicians, and a forensic vocational report obtained by plaintiff's attorney. The vocational report was prepared on March 21, 2001, nearly seven years after plaintiff was fired. *(CF 100177-100179).*

37. MetLife sought to schedule independent medical examinations with an endocrinologist and a psychiatrist. Dr. Mark Silver, an endocrinologist, examined plaintiff on August 3, 2001. Dr.

Sandra Romm, a psychiatrist, examined him on September 14, 2001.  *(CF 100143, 100146, 100149, 100125).*

38.  MetLife provided Drs. Silver and Romm plaintiff's medical records and posed the following questions:  Based upon your review of the information provided and your examination of Mr. Welsh, please provide a written report addressing the following:

- Diagnosis supported by the clinical evidence as of: (1) August 31, 1994; (2) November 30, 1996; and (3) the present.
- Please describe the specific symptoms and clinical evidence supporting the aforementioned diagnosis.
- Specific impairments, as well as restrictions and/or limitations, from August 31, 1994 to the present, which are supported by the clinical evidence.  An explanation of the basis for your assessment should be included.

*(CF 100139, 100156).*

39.  Dr. Silver is a board certified internist who specializes in endocrinology, diabetes and metabolism.  Dr. Silver reviewed plaintiff's medical records, the vocational report, and conducted a physical examination.  Dr. Silver found that as of August 31, 1994 and November 30, 1996, plaintiff's diagnosis would include depression, hypertension, and type 2 diabetes mellitus.  Although plaintiff's chief complaint to Dr. Silver during the 2001 exam was fatigue, which Dr. Silver noted in his report, he explained:

> I would find no clearcut evidence of any specific restrictions and/or limitations from the medical records.  My physical exam did not reveal any obvious physical limitations.

*(CF 100149-100152).*

40.  Dr. Romm is a board certified psychiatrist. Dr. Romm reviewed plaintiff's medical records, the vocational evaluation, and examined plaintiff.  Plaintiff told Dr. Romm that the people he worked with at Deloitte "proceeded to make [his] life miserable."  And that "the final blow was that they could not get me to quit, so they fired me."  Plaintiff told Dr. Romm that he was depressed and suicidal after he was fired, and that he started taking Prozac shortly afterward and since that time has

only been "a little depressed" and tired. Dr. Romm concluded that it was difficult to determine whether the diagnosis of depression was supported in 1994 given that some of Dr. Azer's medical records consisted of illegible handwriting. However, even accepting that diagnosis as accurate, Dr. Romm opined that:

> It is this examiner's belief from a psychiatric standpoint that the patient had no restrictions or limitations in terms of work. He was depressed. His depression was treated and as a previous evaluator has stated, it would have been helpful for him to have returned to work even before the depression was fully resolved as this would have added to his feeling of well being and increased self-esteem. (CF 100137)

*(CF 100125-100137).*

41. Dr. Romm determined that plaintiff currently (in 2001) had major depressive disorder that was in remission. Given some of plaintiff's behavior during the exam and the new symptoms he described, she considered whether currently he had some additional psychiatric conditions. However, she noted that such conditions, such as psychosis, were not caused by not being treated well at work, which was, according to Dr. Katz, the cause of plaintiff's depression. *(CF 100125-100137).*

42. In her report, Dr. Romm noted instances of partially illegible or incomplete records from Dr. Azer. In order to fully develop the record and give every consideration to plaintiff, MetLife requested all of Dr. Azer's records and attempted to have the records transcribed. Dr. Azer did not provide additional records, reporting that they could not be located. *(CF 100104; 100076-100080).*

43. MetLife provided the reports of Dr. Romm and Dr. Silver to plaintiff. *(CF 100104).*

44. The file materials were also reviewed by Dr. Robert Porter, who is Board Certified in occupational medicine. Dr. Porter reviewed plaintiff's medical records, the vocational report, and independent medical examiners' reports on February 20, 2002. Dr. Porter's report notes that plaintiff's more recent medical records showed progressive vision impairments, poorly controlled diabetes, and mild degenerative disc disease of the spine. *(CF 100068-100073).*

45. He notes, however, plaintiff's vision had been corrected to 20/20, poor control of diabetes was due to plaintiff's refusal to monitor his blood sugar and take insulin, and mild

ORDER 10

degenerative disc disease had not caused any limitations. Dr. Porter noted "physical examination findings have not identified significant loss of range of motion of the low back, or loss of strength, sensation, or movement in the lower extremities. Degenerative changes of the spine are common signs of aging. Records do not support significant impairment in low back or lower extremity function due to these changes in [Plaintiff]." *(CF 100068-100073).*

46. With regard to depression, Dr. Porter found:

> Although his complaints of depressed mood and fatigue are consistent with chronic depression, records do not indicate that his depression is of a severity to presently cause significant impairment in functioning. Reports of the severity of his fatigue are not consistent with the documented severity of his depression. Obesity and reconditioning may well contribute to [Plaintiff's] complaints of easily becoming tired. While physical exertion may make [Plaintiff] tired, there is no contraindication to performing physical activity due to his medical conditions.

*(CF 100070).* Dr. Porter also noted that "depression is one of the most common diagnoses in the working population and the diagnosis in itself is not an exclusion to work activities." *(CF 100071).*

47. Dr. Porter was asked to address the specific impairments, restrictions, and/or limitations supported by the clinical evidence that would have precluded plaintiff from performing his regular job as of September 1, 1994. Dr. Porter responded:

> A review of the medical information does not support significant physical impairments that would require significant restrictions and limitations of work duties beginning September 1, 1994. …

*(CF 100070).*

48. Dr. Porter noted that plaintiff had many diagnoses, but that "the information did not support a severity of the condition to have removed [Plaintiff's] ability to perform full-time work activities." Dr. Porter also commented on Dr. Azer's statement that plaintiff's "medical problems can be traced to working in a high-stress environment." Dr. Porter explained "diabetes is not known to be caused by a stressful work environment." And, "although hypertension may be aggravated by high

ORDER                                       11

stress, control with medication, as had been the case with [plaintiff], would not require restrictions of work duties.  There are many work environments that may not be conducive to excellent health.  However, there is no indication that [plaintiff's] option and ability to work has been removed from him from a medical diagnosis."  Dr. Porter concluded:

> In summary, the medical information does not support significant restrictions and limitations of work activities.  Certainly, working at a level of medium work with lifting up to 50 pounds maximum and 20 pounds on a repeated basis would have been within his abilities since September 1994.  There would be no restrictions on sitting, standing, or walking activities.

*(CF 100071-100072).*

49.     Dr. Porter also concluded that "from a psychiatric perspective, there may have been a period from 10/24/95 through 10/16/96 when depression was a significant factor and would have removed the ability of [plaintiff] to perform full time work activities."  However, this was long after plaintiff was fired.  *(CF 100072).*

50.     On May 17, 2002, MetLife provided plaintiff's lawyer with a detailed explanation for its decision to deny his claim on remand.  As MetLife explained, plaintiff claimed to be disabled as of July 13, 1994, but continued to work up until he was fired on August 30, 2004.  *(CF 100056-100059).*

51.     Based on the review of all of the records and the independent medical examination, MetLife found that plaintiff did "not meet the Plan definition of 'disability' or 'disabled' as of August 31, 1994, the day that he physically stopped working for Deloitte & Touche."  *(CF 100056-100059).*

52.     Specifically, MetLife found that plaintiff did not satisfy the first prong of the Plan's definition of disability because there was no medical evidence which would support the conclusion that plaintiff was unable to perform the material duties of his regular job because of an injury or sickness.  MetLife found that plaintiff did not satisfy the third prong because "the medical evidence does not establish that [plaintiff], due to injury or sickness, was unable to perform all of the material duties of his regular job on a full-time basis as of August 31, 1994."  *(CF 100056-100059).*

53. Plaintiff appealed that decision on June 27, 2002, claiming that his job required additional "abilities," which he had not mentioned in his initial claim. For example, plaintiff now claimed that he did not have "the ability to convince others of the correctness of his decision and opinions" or "the ability to get along with D&T superiors, equals, and staff." *(CF100036-100038; 100041-100043).*

54. Plaintiff retained another attorney. At the new attorney's request, MetLife deferred a decision on appeal pending further instructions from the new attorney. Plaintiff, however, then claimed that the new attorney was not representing him and requested a review of the appeal dated June 27, 2002. *(CF 100034, 100025).*

55. MetLife asked Dr. Porter to review plaintiff's appeal letter including the new "abilities" plaintiff claimed were required and advise if the information would change his prior opinion. *(CF 100027).*

56. On September 2, 2002, Dr. Porter reviewed plaintiff's appeal and responded: "It does not follow, however, that the ability to perform his job duties has been removed from [plaintiff] due to long hours and high stress and any effects on diabetes or hypertension. [Plaintiff's] medical conditions of hypertension and diabetes do not cause impairments that have removed the ability to perform his job duties." *(CF 100018, 100020).*

57. Dr. Porter also noted that there was a "compliance factor" in plaintiff's diabetes control as plaintiff's more recent medical records show that he refuses to check his blood sugars. Dr. Porter noted that "improved compliance is associated with control of diabetes and hypertension." Dr. Porter concluded that plaintiff's appeal did not change his assessment of plaintiff's functional abilities. *(CF 100018-100020).*

58. On September 23, 2002, MetLife advised that it had completed its reevaluation of plaintiff's claim and determined that the decision would be upheld. Plaintiff filed suit seeking judicial review of MetLife's decision on remand on March 16, 2004. *(CF 100010-100011).*

**Conclusions of law.**

1. The abuse of discretion standard of review applies to plaintiff's claims and to MetLife's determination that plaintiff was not disabled under either prong one or prong three of the policy's disability definition. Claims administrators abuse their discretion if they make a decision without any explanation, construe provisions of the plan in a way that conflicts with the plain language of the plan, fail to develop facts necessary to make the determination, or base the decision on an erroneous view of the law and/or "clearly erroneous" findings of facts. *Schikore v. Bankamerica Supplemental Retirement*, 269 F.3d 956, 960 (9th Cir. 2001). In the ERISA context, decisions which are contrary to evidence in the record are not necessarily an abuse of discretion. *See Taft. v. Equitable Lief ins. Soc.*, 9 F.3d 1469 (9th Cir. 1993). Instead, abuse of discretion in this context means that the entire record leads to the firm conviction that a mistake has been made by the plan administrator. *Boyd v. BertBell/Pete Rozell NFL Players Retirement Plan*, 410 F.3d 1173, 1179 99th Cir. 2005). Accordingly, the district court should defer to the administrator's decision if the record shows it is based on a reasonable interpretation of the plan's terms and was made in good faith. *See Jordan v. Northrup Grumman Corp. Welfare Plan*, 370 F.3d 869 (9th Cir. 2004).

2. The claim administrator, MetLife, was bound to conduct a full and fair review of plaintiff's claim. Plaintiff argues that MetLife failed to give his claim the required review in this case. The bulk of his argument is his claim that additional information which was available and which might have bolstered his claim was not obtained, and that MetLife did not inform him of additional information which would assist him in supporting his claim. He emphasizes the "gaps" in Dr. Azzer's records and the failure to order further psychological analysis. Plaintiff Cites *Booton v. Lockheed Medical Benifit Plan,* 110 F.3d 1461 (9th Cir. 1997) and similar cases for the proposition that an ERISA claim is to be an "interactive process" with "meaningful dialogue" between the administrator and the beneficiary. As *Booton* explains, :

> In simple English, what this regulation calls for is a meaningful dialogue
> between ERISA plan administrators and their beneficiaries. If benefits are
> denied in whole or in part, the reason for the denial must be stated in
> reasonably clear language, with specific reference to the plan provisions that

ORDER                                                          14

> form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.

*Booton*, 110 F.3d at 1063.  Plaintiff here focuses on the fact that MetLife did not disclose to him what additional information he needed to provide in order to prevail on his claim.  It is true that the various denial letters do not explain in any detail what additional information Mr. Welsh might provide in order to obtain benefits under the plan.  However, *Booton* and the underlying regulations do not require the administrator to seek and obtain additional information in every case as a prerequisite to denying coverage.  If that were the rule, a claim might only be denied when the plaintiff failed to provide information – at some point, the information available is sufficient for the administrator to make a determination, even if that determination is that there is no coverage for the claim.  In this case, the administrator did not obtain all possible supplemental information, but that does not mean that it abused its discretion in denying the claim.  *Booton* and similar authority require the administrator to follow up "if they beleive that more information is needed to make a reasoned decision."  Where, as here, they do not need additional information, the claim denial is not improper simply because there might conceivably be additional opinion testimony available to the claimant.

3.   MetLife did not abuse its discretion in failing to provide yet more time and more opportunity to Mr. Welsh to supplement and support his claim.  The records upon which this claim was determined was adequately developed, and the various claim denial letters described in sufficient detail the reasoning behind the claim determination.  This conclusion is not undermined by the fact that some of the evidence in the record supported Mr. Welsh's claim of disability.

4.   For these reasons, under the relevant authority, MetLife did not abuse its discretion in denying Mr. Welsh's claim.

///

5. Plaintiff's claim is dismissed.

DATED this 15th day of November, 2005.

/s/ Ronald B. Leighton
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE